UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LARRY DANIEL HARRIS,<br><br>Defendant. | Case No.  1:95-CR-05111-JLT<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SENTENCE MODIFICATION PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)<br><br>(Doc. 616) |

Larry Daniel Harris moves the Court for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  (Doc. 616).  Harris has now served more than 27 years in prison for a string of armed robberies in 1994.  He moves for a sentence reduction based on evidence of his rehabilitation and changes in federal law that shortened the mandatory minimum sentences for his crimes.  The government opposes the motion, (Doc. 621), and Harris has filed a reply.  (Doc. 628.)  Harris's counsel has supplemented his motion on several occasions.  (Docs. 648, 651.)  For the reasons explained below, Harris's motion is **GRANTED**.

**BACKGROUND**

A string of armed robberies occurred in 1994 in restaurants and hotels in and around Fresno, California, where defendant Larry Harris was on a football scholarship at Fresno State University for the 1993–1994 school year.  Seven men were arrested for these robberies, including Harris, and five pled guilty.  After a jury trial, Harris was convicted of five counts of

interference with interstate commerce by robbery (Hobbs Act robbery) in violation of 18 U.S.C. § 1951(a), as well as four counts of use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1).

Judge Oliver W. Wanger sentenced Harris to the statutory minimum sentence applicable at the time for each crime: 121 months for each of the five robbery counts (to be served concurrently), followed by 60 months for the first count of use of a firearm and 240 months for each of the other counts of use of a firearm (to be served consecutively as required by § 924(c)(1)).  Harris's total sentence was therefore 1141-months in prison followed by 36 months of supervised release—95 years in prison without the possibility of parole.

During sentencing, Judge Wanger expressed frustration that the Court did not have the discretion to depart downward from the required minimums.  He noted that if the Court had such discretion, it would have sentenced Harris to only 437 months, departing downward based on Harris's youth, insignificant prior criminal record, and productive life as a college student.  Judge Wanger noted that the lower sentence would "constitute fitting punishment," deter others from committing similar crimes, and provide rehabilitation opportunities.  (Doc. 616 at 39, Exhibit C); *see also United States v. Harris*, 154 F.3d 1082, 1083 (9th Cir. 1998).

The Ninth Circuit affirmed Harris's conviction and sentence in two separate opinions.  *Harris*, 154 F.3d at 1085 (affirming 1,141-month sentence but commenting, "[w]e do not believe that Harris needs to be in prison when he is 100"); *United States v. Harris*, 163 F.3d 608 (9th Cir. 1998) (affirming conviction).  In 2003, this Court denied defendant's first motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255, (Doc. 526), after which the Ninth Circuit denied a certificate of appealability.  (Doc. 538.)  Harris continued to challenge his sentence.  (*See* Docs 593, 597, 600, 611.)

Harris is currently located at U.S. Bureau of Prisons' ("BOP") Victorville USP, a high security penitentiary.  *Find an inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited May 6, 2022).  To date, Harris has served approximately 27 years of his sentence and has an anticipated release date in 2076.

///

2

1

## LEGAL STANDARD

2      A court generally "may not modify a term of imprisonment once it has been imposed."  18

3  U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of

4  conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not

5  be modified by a district court except in limited circumstances.").  Those limited circumstances

6  include compassionate release in extraordinary cases.  *See United States v. Holden*, 452 F. Supp.

7  3d 964, 968 (D. Or. 2020).  Under the First Step Act of 2018 ("the FSA") imprisoned defendants

8  may bring their own motions for compassionate release in the district court.  18 U.S.C. §

9  3582(c)(1)(A) (2018).  In this regard, the FSA specifically provides that a court may

10
11
12
13
14
15
       upon motion of the defendant after the defendant has fully exhausted
       all administrative rights to appeal a failure of the [BOP] to bring a
       motion on the defendant's behalf[1] or the lapse of 30 days from the
       receipt of such a request by the warden of the defendant's facility,
       whichever is earlier, may reduce the term of imprisonment (and may
       impose a term of probation or supervised release with or without
       conditions that does not exceed the unserved portion of the original
       term of imprisonment), after considering the factors set forth in [18
       U.S.C. §] 3553(a) to the extent that they are applicable, if it finds
       that –

16
       (i)     extraordinary and compelling reasons warrant such a
               reduction; or

17
18
19
20
       (ii)    the defendant is at least 70 years of age, has served at least 30
               years in prison, pursuant to a sentence imposed under section
               3559(c), for the offense or offenses for which the defendant
               is currently imprisoned, and a determination has been made
               by the Director of the [BOP] that the defendant is not a danger
               to the safety of any other person or the community, as
               provided under section 3142(g);

21
22
       and that such a reduction is consistent with applicable policy
       statements issued by the Sentencing Commission[.]

23  18 U.S.C. § 3582(c)(1)(A)(i) and (ii).

24      The policy statement with respect to compassionate release in the U.S. Sentencing

25

26
27
28
[1] If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that
denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response." 28
C.F.R. § 542.15(a).  If the Regional Director denies a defendant's administrative appeal, the defendant must appeal
again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed." *Id.*  "Appeal
to the General Counsel is the final administrative appeal." *Id.*  When the final administrative appeal is resolved, a
defendant has "fully exhausted all administrative rights." *See* 18 U.S.C. § 3582(c)(1)(A).

1    Guidelines sets out criteria and circumstances describing "extraordinary and compelling reasons."

2    U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13;[2] *see also United States v. Gonzalez*,

3    451 F. Supp. 3d 1194, 1197 (E.D. Wash. 2020) (noting that courts "universally" rely on U.S.S.G.

4    § 1B1.13 to define "extraordinary and compelling reasons," even though that policy statement

5    was issued before Congress passed the FSA and authorized defendants to file compassionate

6    release motions).  However, the Ninth Circuit has held "that the current version of U.S.S.G.

7    §1B1.13 is not an 'applicable policy statement[ ]' for 18 U.S.C. § 3582(c)(1)(A) motions filed by

8    a defendant." *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021).  "In other words, the

9    Sentencing Commission has not yet issued a policy statement 'applicable' to § 3582(c)(1)(A)

10   motions filed by a defendant." *Id.*  The Ninth Circuit clarified that "[t]he Sentencing

11   Commission's statements in U.S.S.G. § 1B1.13 may inform a district court's discretion for

12   § 3582(c)(1)(A) motions filed by a defendant, but they are not binding." *Id.* (citing *United States

13   v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)).

14          In the past, when moving for relief under 18 U.S.C. § 3582(c), courts recognized that the

15   defendant bore the initial burden of demonstrating that a sentence reduction was warranted.  *See*

16   *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998).  Although the Ninth Circuit

17   has not specifically addressed the question of which party bears the burden in the context of a

18   motion for compassionate brought pursuant to § 3582(c) as amended by the FSA, district courts

19   have agreed that the burden remains with the defendant.  *See, e.g.*, *United States v. Mathews*, No.

20   2:15-CR-00118-KJM, 2021 WL 3883735, at *3 (E.D. Cal. Aug. 31, 2021); *United States v.*

21   *Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020); *United*

22   *States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, at *3 (W.D. Wash. May 7, 2020).

23                                          **ANALYSIS**

24          To evaluate a request for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), a

25   court must consider three requirements:

26

27   [2]  The Sentencing Guidelines also require that to be granted a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A),
     the defendant must not pose "a danger to the safety of any other person or to the community, as provided in 18
28   U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

First, as a threshold matter, the statute requires defendants to exhaust administrative remedies. 18 U.S.C. § 3582(c)(1)(A). Second, a district court may grant compassionate release only if "extraordinary and compelling reasons warrant such a reduction" and "that such reduction is consistent with applicable policy statements issued by the Sentencing Commission. *Id.* Third, the district court must also consider "the factors set forth in Section 3553(a) to the extent that they are applicable." *Id.*

*United States v. Rodriguez*, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019); *see also United States v. Ramirez-Suarez*, 16-CR-00124-LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *United States v. Parker*, 461 F. Supp. 3d 966, 970 (C.D. Cal. 2020); *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be "consistent with" the sentencing factors set forth in §3553(a)).

**A.      Administrative Exhaustion**

Section 3582(c)(1) permits a defendant to apply to a federal district court for sentence modification only "after the defendant has fully exhausted all administrative rights to appeal the failure of the BOP to bring a motion . . . or the lapse of 30 days from the receipt of such request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A). The government concedes that more than 30 days have elapsed since Harris's request for a sentence reduction was received. (Doc. 621 at 5.) The Court will therefore address the merits of Harris's motion.[3]

**B.      Extraordinary and Compelling Reasons**

When the Ninth Circuit affirmed Harris's sentence, it published its decision specifically to "urge Congress to reconsider its scheme of mandatory consecutive minimum sentences and to grant district court judges the discretion to set sentences at the level appropriate for the circumstances of a particular defendant and his or her crimes." *Harris*, 153 F.3d at 1083. In 2018, Congress heeded this call for reform by passing the First Step Act, which significantly altered the sentencing scheme applicable to § 924(c) violations. Harris now argues that the

---

[3]  In its opposition, the government raises concerns about this Court's jurisdiction to decide Harris's motion. These concerns were based on pending appeals related to Harris's previous effort to obtain habeas relief. The Court need not address these arguments, as they are now moot; the Ninth Circuit denied Harris's request for a certificate of appealability as to his § 2255 motion, and the Supreme Court denied certiorari. https://www.supremecourt.gov/orders/courtorders/032921zor_nmip.pdf.

1  change to § 924(c) sentencing law has created an extraordinary and compelling sentencing

2  disparity that warrants relief.  (Doc. 616 at 14–15.)

3       Prior to the FSA, prosecutors could "stack" multiple counts of § 924(c) firearms

4  violations, which resulted in defendants without previous weapons convictions being charged for

5  both a first offense—carrying a five-year mandatory minimum—and a "second or subsequent

6  offense"—carrying a mandatory twenty- or twenty-five-year sentence, to be served

7  consecutively—in the same indictment.  *United States v. Jones*, 482 F. Supp. 3d 969, 978 (N.D.

8  Cal. 2020) (citing *Deal v. United States*, 508 U.S. 129, 132 (1993)).  As such, someone convicted

9  of two § 924(c) counts in a single offense automatically faced a minimum sentence of 25–30

10  years.

11       Section 403(a) of the FSA eliminated this practice by requiring the higher penalty only

12  where a defendant is convicted of a § 924(c) violation after a previous § 924(c) conviction has

13  become final.  First Step Act, Pub. L. No. 115-391, Title IV, § 403, 132 Stat. 5221–22 (2018).

14  The First Step Act now only requires mandatory consecutive sentences of 5–7 years for each

15  § 924(c) count in the same indictment, with the two-year enhancement applicable to defendants

16  who brandish their weapons.  *Id*.  Therefore, if Harris were sentenced today for his conduct, his

17  sentence would amount to at least 50 years fewer than the 1141 months he is currently serving.

18  Harris asks the Court to find that this immense disparity between these sentences is an

19  extraordinary and compelling reason for sentence modification under § 3582.

20       The government contests that the sentencing disparity caused by the FSA cannot justify

21  relief because Congress did not make § 403's changes retroactive.  (Doc. 621 at 5–8.)  There is a

22  split of authority on this question.  Some courts express concern that granting a motion for

23  sentence reduction under § 3582(c)(1)(A) based on changes to § 924(c) would "supplant the

24  retroactivity determination of courts . . . for the retroactivity determination of Congress."  *United

25  States v. Andrews*, 480 F.Supp.3d 669 (E.D. Pa. 2020); *accord*, *e.g.*, *United States v. Fulcher*, No.

26  98-0119, 2020 WL 4547970, *2 (S.D. Ind. Aug. 5, 2020) ("If Congress intended to authorize

27  courts to exercise discretion to apply [the First Step Act] retroactively to otherwise ineligible

28  defendants, it would have included that amendment . . . [The defendant] may not use 18 U.S.C. §

3582(c)(1)(A)(i)'s 'extraordinary and compelling' provision as an end-around to achieve a result that Congress did not intend.")

Other courts, including many in California and in this district, have rejected this reasoning on the grounds that a statute's lack of retroactivity "does not prohibit the court from considering [] legislative change in deciding whether to reduce [a defendant's] sentence." *United States v. Parker*, No. 2:97-cr-202-TLN-EFP, 2021 WL 1966409 at *3 (E.D. Cal. May 17, 2021) (citing cases); *see also United States v. Smith*, 538 F.Supp.3d 990, 1000 (E.D. Cal. 2021). As the Fourth Circuit explained in *United States v. McCoy*, "there is a significant difference between automatic vacatur and resentencing of an entire class of sentences—with its 'avalanche of applications and inevitable resentencings'—and allowing for the provision of individual relief in the most grievous cases." 981 F.3d 271, 286–87 (4th Cir. 2020) (quoting *United States v. Haynes*, 456 F. Supp. 3d 496, 516 (E.D.N.Y. 2020)). "[T]he very purpose of § 3582(c)(1)(A) is to provide a 'safety valve' that allows for sentence reductions when there is not a specific statute that already affords relief but 'extraordinary and compelling reasons' nevertheless justify a reduction." *Id.* at 287 (emphasis in original). The undersigned is persuaded by this reasoning and joins those other district courts in finding that the enactment of the First Step Act and its elimination of "stacked" sentences for multiple § 924(c) charges may constitute an extraordinary and compelling reason that weighs in favor of compassionate release in some particular cases—including this one.

Harris was only 19 years old at the time of the robberies. *United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121 at *5 (D. Utah Feb. 18, 2020), *aff'd*, 993 F.3d 821 (10th Cir. 2021) (defendant's youth at the time of arrest weighs in favor of compassionate release). He has now "served over 25 years in prison, more than half his life." *United States v. Jones*, 482 F. Supp. 3d at 979 (noting the 15 year disparity between the defendant's sentence and the sentence that would have likely been imposed today); *Maumau*, 2020 WL 806121 at *5 (reducing a 57-year sentence); *United States v. McPherson*, 454 F. Supp. 3d 1049, 1053 (W.D. Wash. 2020) (granting sentence reduction and release where defendant had served more than 26 years for "what is now probably a 17-year crime"); *United States v. Ngo*, No. 97-CR-3397-GPC, 2021 WL 778660, at *4 (S.D. Cal. Mar. 1, 2021) (a prison term 15 years longer than defendant

1   would face if sentenced today constitutes an "extraordinary and compelling" reason for sentence

2   reduction, particularly when combined with evidence of defendant's rehabilitation); *United States*

3   *v. Quinn*, 467 F. Supp. 3d 824, 828 (N.D. Cal. 2020) (finding that it would be unnecessarily cruel

4   and unproductive for a defendant to remain in prison in the face of a 30-year disparity between

5   his imposed sentence and the one that Congress would now deem sufficient for his conduct);

6   *United States v. Sanchez*, No. 1:95-CR-05038-DAD, 2021 WL 2808702 (E.D. Cal. July 6, 2021)

7   (reducing similarly-situated defendant's sentence to time served).

8         Both the sentencing judge and the Ninth Circuit expressed pointed concern not only about

9   the practice of stacking § 924(c) sentences prior to the FSA, but about the unjust and

10  unnecessarily lengthy punishment that Harris received in this particular case.[4]   Compared to the

11  five co-defendants that pled guilty for the same string of robberies, Harris received nearly ten

12  times the punishment.  (Doc. 628 at 13.)  Considering all of these factors, the Court finds that

13  Harris has met his burden of demonstrating extraordinary and compelling reasons warranting

14  relief under § 3582(c)(1)(A).

15  **C.      Consistency With the § 3553(a) Factors**

16        As discussed above, "changes to § 924(c) can be one of any number of 'extraordinary and

17  compelling reasons' to grant a motion for compassionate release, if a defendant's individual

18  characteristics support that finding."  *Smith*, 538 F. Supp. 3d at 1000.  Thus, any relief granted

19  pursuant to 18 U.S.C. § 3582(c)(1)(A) must be consistent with consideration of the sentencing

20  factors set forth in 18 U.S.C. § 3553(a).[5]  *See Parker*, 461 F. Supp. 3d at 979.  Here, consideration

21  [4]   The fact that the court expressed concern at the time of sentencing has no bearing on whether it may now be

22  grounds for a compassionate release.  As the Sentencing Commission has noted, "an extraordinary and compelling
    reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of

23  imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or
    anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement."  U.S.

24  SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.2.

25  [5]   Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court shall consider:  the
    nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence

26  imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the
    offense, afford adequate deterrence, protect the public from further crimes of the defendant and provide the defendant

27  with needed educational or vocational training, medical care, or other correctional treatment in the most effective
    manner; the kinds of sentences available; the kinds of sentence and the sentencing range established for the

28  applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; any
    pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities

1   of the § 3553(a) sentencing factors support Harris's release.

2          Harris is currently serving a 1141-month sentence for interference with commerce by

3   robbery and use of a firearm during a crime of violence.  Harris's offenses were undoubtedly

4   serious and sometimes violent.  (Doc. 621 at 13.)  The nearly three decades that Harris has served

5   in prison reflects that seriousness, promotes respect for the law, and provides just punishment.

6   The government's opposition to this conclusion is belied by the fact that it previously offered

7   Harris a plea deal in which he would have served a maximum of 25 years in prison, not

8   accounting for good time credits.  (Doc. 612 at 70, 74); *see United States v. Marks*, 455 F. Supp.

9   3d 17, 37 (W.D.N.Y. 2020), *appeal withdrawn*, No. 20-1404, 2021 WL 16884774 (2d Cir. Jan. 5,

10  2021) (finding that government's prior willingness to consider a 20-year plea deal undercuts any

11  present argument that a defendant is too dangerous to be released before the end of a much longer

12  sentence).  The government also offered Harris's co-defendants, some of whom committed more

13  robberies and exhibited more violent behavior than Harris during the course of their conduct,

14  markedly lower sentences than Harris in their plea deals.  In fact, of seven co-defendants, the only

15  two still incarcerated are Harris and Eugene Steward, both of whom exercised their right to trial.

16  The co-defendant who spent the most time in prison, aside from Harris and Steward, was released

17  more than ten years ago.  (Doc. 628 at 13.)  Therefore, the government cannot convincingly argue

18  public safety concerns regarding these defendants based solely on the 1994 robberies.

19         Furthermore, Harris has taken his incarceration seriously.  He has admitted the error of his

20  ways and concretely demonstrated a commitment to self-improvement even as he faced what was

21  effectively a life sentence.  (*See* Docs. 616 at 98–108; 648-1.)  While in prison, Harris has

22  completed 75 Adult Continuation Education Programs and 20 Release Preparation Programs, in

23  addition to taking enough courses through the Distance Learning College Program to be within

24  four classes of earning *three* associate degrees.  (Doc. 616 at 11, 130–143.)  He also completed

25  the Bureau of Prisons Challenge Program, a 400-hour cognitive behavioral treatment program

26  focused on addressing substance use and harmful thought and behavior patterns.  (Doc. 616 at

27  _____

28  among defendants with similar records who have been found guilty of similar conduct; and the need to provide
    restitution to any victims of the offense.

1   117.)  Most participants do not complete the program because they either quit or get expelled, but

2   Harris was a standout participant.  (Doc. 616 at 133.)

3        According to Jessica Hastings, a clinically trained therapist who worked with Harris in her

4   role as a Challenge Treatment Specialist, Harris was viewed as a "respected member of the

5   treatment community" who "utilized his own personal time to mentor and assist other program

6   participants, both during and outside of programming hours."  (Doc. 616 at 117.)  Harris

7   additionally demonstrated continued application of core program concepts, modeled pro-social

8   behaviors to his peers, and showed a commitment to others around him.  (*Id.*)  Hastings

9   additionally states that Harris acknowledges his past mistakes and has made "efforts to evaluate

10  them to ensure he does not repeat them . . . he is focused on his future and making the most of any

11  opportunity he might be provided to demonstrate his commitment to his lifestyle change."  (*Id.*)

12       Hastings's impressions of Harris are confirmed by Jesse Valero, Lieutenant with BOP's

13  Special Investigations Services, who has known Harris for at least a decade.  According to

14  Valero, Harris has set himself apart from others who participate in negative behavior as a result of

15  peer pressure and "developed the rare ability to make positive decisions while incarcerated."

16  (Doc. 616 at 118.)  Valero also describes Harris as being "viewed by the inmate community as a

17  problem solver and mentor" who, on various occasions, has been able to "defuse situations with

18  other inmates and groups" that may otherwise have become violent.  (*Id.*)

19       Harris's mentorship, impact, and character are further supported by the several letters that

20  fellow inmates wrote to the Court in support of Harris's motion.  Demarvin Bracken, for example,

21  described Harris as a mentor who helped transition Bracken into "the productive man [he is]

22  today."  (Doc. 616 at 129.)  Bracken highlights that Harris tutored him through completing his

23  GED and guided Bracken through the Culinary Arts Program—a certification which Bracken has

24  leveraged upon release to purchase his own catering truck upon release from prison.  (*Id.*)

25       With these references in mind, it is unsurprising that Harris was admitted into the selective

26  Suicide Watch Inmate Companion Program.  Inmates for this program are screened extremely

27  carefully before being selected as companions, due to the liability that prisons would face if

28  inmates committed suicide while in the program.  (Doc. 628-9 at ¶ 8.)  Harris was described as an

1    "asset" to this program until his graduation in 2018.  (Doc. 616 at 140–141.)  While Harris's

2    rehabilitation alone is not enough to warrant compassionate release, *see* 28 U.S.C. § 994(t);

3    U.S.S.G. § 1B1.13, cmt. n.3, the Court is persuaded that Harris has made sincere and serious

4    efforts in that regard.

5            The government points to Harris's BOP disciplinary history to undercut the above record

6    of productivity and rehabilitation, arguing that Harris is a "danger to the safety of any other

7    person or to the community" due to his "prison disciplinary record involving violent conduct".

8    (Doc. 621 at 8.)  According to the BOP records attached to the government's opposition, Harris

9    has been disciplined for relevant conduct exactly twice—once in 2001, and once in 2018.  In

10   2001, records show that Harris was "fighting with another person," and asserted that he was not

11   actually fighting but intervened to break up a disagreement between other inmates.  (Doc. 621-1

12   at 4.)  In 2018, the record merely states that Harris was "found guilty of assaulting another

13   inmate . . . w/o serious injury".  (*Id*. at 1.)  Harris received a seven-day sentence for this

14   infraction.

15           Harris contends that this fight was actually in self-defense and necessary to resolve a

16   threat to himself on the yard.  Specifically, because Harris receives a lot of visitors, he was being

17   pressured by other inmates to bring drugs into the facility.  Immediately preceding the assault,

18   Harris had been told that three inmates were going to attack him in retaliation for his refusal to do

19   so.  (Doc. 628 at 57.)  This tactic of causing a minor scuffle to trigger staff intervention is

20   common according to the sworn declaration of Kevin Mitchel.  (Doc. 628-9 at ¶ 9.)  This method

21   allows an inmate to seek safety without "putting their lives in danger by being branded a snitch."

22   (*Id.*)  The government has not challenged Harris's narrative regarding either assault.  In the

23   Court's view, the nature and infrequency of these infractions does not support the conclusion that

24   Harris is a danger to public safety.  *United States v. Neal*, No. 2:09-cr-00089-JAM-KJN, 2020

25   WL 4476718, at *3 (E.D. Cal. Aug. 4, 2020) (granting release despite expressing concern that

26   defendant played a role in "two in-custody assaults over the past four years" because "viewing

27   [defendant's] record as a whole," "the steps she's taken toward self-reflection and rehabilitation

28   paint a more accurate picture of her time in prison than do the missteps she's made along the

11

1  way")

2        Finally, Harris has demonstrated family support and a stable release plan.  He will live

3  with his mother, who resides near the Hope for Prisoner program that offers a variety of training

4  programs for clients to build and strengthen skills for employment, leadership development, and

5  success in reintegrating.  Hope For Prisoners, About Us, available at

6  https://hopeforprisoners.org/our-story/.  Larry's advocate and god-sister, Dawn Franks, is a

7  proponent of the program who has identified a mentor for Harris.  (Doc. 616 at 111.)  Ms. Franks

8  is one of many family members who have written to the Court on Harris's behalf.  (*See* Doc. 616

9  at 110–129.)  These letters demonstrate that Harris will be well-supported upon his release.  Any

10 remaining concerns of recidivism or danger to the public can be best served by Harris's

11 supervised release conditions and the assistance of a probation officer.  *See McPherson*, 454 F.

12 Supp. 3d at 1053. For the reasons discussed above, the Court finds that granting Harris's motion

13 for compassionate release is consistent with the sentencing factors set forth in §3553(a).

14                            **CONCLUSION**

15        Accordingly:

16    1.     Defendant Harris's motion for compassionate release pursuant to 18 U.S.C.

17           § 3582(c)(1)(A) (Doc. 646) is **GRANTED**.

18    2.     Defendant Harris's sentence is reduced to **TIME SERVED**.[6]

19    3.     Defendant Harris shall be **RELEASED IMMEDIATELY** to begin the 36-month

20           term of supervised release with the amended special and standard conditions as

21           listed below.

22    4.     All other aspects of defendant Harris's original sentence remain intact, including a

23           $500 special assessment and $9,711.30 to be paid in restitution.  (Doc. 257.)

24                   **SPECIAL CONDITIONS OF SUPERVISION**

25 1.     The defendant shall submit to the search of his person, property, home, and vehicle by a

26 United States probation officer, or any other authorized person under the immediate and personal

---

[6] Counsel have attested to Mr. Harris' ability to reside with his mother.  Should this not be possible at the time he is released, the Court anticipates he will propose a residence that the probation officer approves, or he will agree to live in a residential reentry facility.

supervision of the probation officer, based upon reasonable suspicion, without a search warrant. Failure to submit to a search may be grounds for revocation.  The defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition

2.	The defendant shall not dispose of or otherwise dissipate any of his assets until the fine and/or restitution order by this Judgment is paid in full, unless the defendant obtains approval of the Court or the probation officer.

3.	The defendant shall apply all monies received from income tax refunds, lottery winnings, inheritance, judgments and any anticipated or unexpected financial gains to any unpaid restitution ordered by this Judgment.

4.	The defendant shall provide the probation officer with access to any requested financial information.

5.	The defendant shall not open additional lines of credit without the approval of the probation officer.

6.	As directed by the probation officer, the defendant shall participate in an outpatient correctional treatment program to obtain assistance for drug or alcohol abuse.

7.	As directed by the probation officer, the defendant shall participate in a program of testing (i.e. breath, urine, sweat patch, etc.) to determine if he has reverted to the use of drugs or alcohol.

8.	The defendant shall abstain from the use of alcoholic beverages and shall not enter, visit, or be present at those places where alcohol is the chief item of sale.

9.	As directed by the probation officer, the defendant shall participate in a co-payment plan for treatment or testing and shall make payment directly to the vendor under contract with the United States Probation Office of up to $25 per month.

10.	As directed by the probation officer, the defendant shall complete up to 20 hours of unpaid community service per week until employed for at least 30 hours per week or participating in a previously approved educational or vocational program.

11.	The defendant shall make payments toward any unpaid criminal monetary penalty in this case during supervised release at the rate of at least 10% of your gross monthly income. Payments are to commence no later than 60 days from placement on supervision.  This payment

schedule does not prohibit the United States from collecting through all available means any unpaid criminal monetary penalty at any time, as prescribed by law.

### STANDARD CONDITIONS OF SUPERVISION

1.      You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2.      After initially reporting to the probation office, you will receive instructions from the Court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.      You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the Court or the probation officer.

4.      You must answer truthfully the questions asked by the probation officer.

5.      You must live at a place approved by the probation officer.  If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change.  If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.      You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.      You must work full time (at least 30 hours per week) at a lawful type of employment unless the probation officer excuses you from doing so.  If you do not have full-time employment, you must try to find full-time employment, unless the probation officer excuses you from doing so.  If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.      You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.      If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10.     You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person, such as nunchakus or tasers).

11.     You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the Court.

12.     If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.

13.     You must follow the instructions of the probation officer related to the conditions of supervision.

IT IS SO ORDERED.

Dated:   **May 9, 2022**

_Jennifer L. Thurston_
UNITED STATES DISTRICT JUDGE

15